**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KAREY R. LUCHTEL,
        *Plaintiff-Appellant,*

v.

OFFICER CLARK HAGEMANN, a
Seattle Police Officer, in his
individual and official capacity;
OFFICER THOMAS HANLEY, a Seattle
Police Officer, in his individual
and official capacity; SPD
OFFICERS J. DOE #1 AND J. DOE #2,
whose identity is presently
unknown, in their individual and
official capacities; GIL
KERLIKOWSKE, Chief of Police, in
his individual and official
capacity; JOHN AND JANE DOE #3-7,
Supervisory Police Officers of the
City of Seattle, the identity and
number of whom are presently
unknown, in their individual and
official capacities; RICHARD AND
JANE 1-5 DOE, municipal
policymakers of the city of Seattle,
the identity and number of whom
are presently unknown, in their
individual and official capacities;
CITY OF SEATTLE, a Municipal
Corporation,
        *Defendants-Appellees.*

No. 09-35446

D.C. No.
2:07-cv-01448-RSM

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Submitted without argument December 11, 2009
Submission withdrawn February 24, 2010
Argued and Submitted
May 18, 2010—Seattle, Washington

Filed October 7, 2010

Before: Robert R. Beezer, Ronald M. Gould and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Gould;
Partial Concurrence and Partial Dissent by Judge Beezer

## COUNSEL

John J. Kannin (argued), Kannin Law Firm P.S., Tukwila, Washington, for the plaintiff-appellant.

Ted Buck (argued) and James R. Lynch, Stafford Frey Cooper, Seattle, Washington, for the defendants-appellees.

## OPINION

GOULD, Circuit Judge:

Karey Luchtel, after using crack cocaine and fearing that her husband was trying to kill her, ran into the street with her young son. Witnesses who called 911 reported that she was screaming for help and threatening to harm herself. She hid under a car until her neighbors provided refuge in their house. The police were summoned by Luchtel's husband and other neighbors who heard her screams. Inside the neighbors' house, the officers confronted Luchtel, and she stated that they were not actual police officers but assassins hired to kill her. Luchtel grabbed her elderly neighbor to use for protection. After using their bodies and handcuffs to detain and arrest Luchtel, the officers took her to a hospital for mental evaluation and treatment of injuries.

Luchtel sued under 42 U.S.C. § 1983, contending that there was a lack of probable cause to arrest her, and that excessive force was used by the officers. She also sued under Washington state law for, among other things, false arrest, negligence, and assault and battery. The district court granted summary judgment for the defendants on all claims. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

**I**

In late 2004 Luchtel began using and became addicted to crack cocaine. In time, she became reclusive and showed some paranoia. On May 18, 2005, Luchtel smoked crack cocaine around 4:00 p.m. That evening, her husband offered her a glass of wine, but she became convinced that, because he was a toxicologist, he was trying to poison her. Luchtel ran from the house with her young son, S.L., and she and S.L. hid under a parked car. Luchtel screamed for help, yelling that someone was trying to kill her.

Several neighbors called 911. One reported that a woman was yelling in the street that someone was trying to kill her. Another reported that the screaming woman was threatening to kill herself. Still another said that the screaming woman was "high on something." While police were en route, Luchtel went to the house of her neighbors, the Walds.

Two police officers, Officer Clark Hagemann and Officer Thomas Hanley, responded to the 911 calls. The officers spoke to Luchtel's husband, who said that his wife was running around the neighborhood out of control on drugs, and that she had now gone to the Walds' house. The officers went next door to the Walds' house, where the events occurred that led to this lawsuit.

On all accounts, Luchtel became terrified at the officers' arrival. Officer Hanley stated that Luchtel's eyes were wide, her breathing was rapid, her muscles were taught, and she

looked like she was "ready to spring." Mrs. Wald said that as soon as Luchtel saw the officers, "she just went, I would say, ballistic." Luchtel told Mrs. Wald, "Don't let them come in. They're going to take—they're going to kill me. This is not the police. They're going to kill me." Mr. Wald took Luchtel's son downstairs, fearing that "things were happening so fast that maybe [S.L.] shouldn't be part of it."

Luchtel could not remember whether Mrs. Wald was sitting or standing, but she testified that when the officers walked in, she stood up and grabbed onto Mrs. Wald, seeking her protection. Mrs. Wald reported that the officers moved in "to grab" Luchtel and Luchtel "put her arms around" Mrs. Wald. Mrs. Wald recounted, "I think she was hoping that I was protecting her, because she, she kind of lounged [sic] at me. And then when the police came over to her, we both fell on the floor." Mrs. Wald did not remember whether the officers first lunged for Luchtel or whether Luchtel first lunged toward Mrs. Wald. Luchtel alleges that the officers moved in to grab her and she responded by seeking the protection of Mrs. Wald. The officers allege that after S.L. left the room, Luchtel immediately "shot up" from the corner, darted across the room, and grabbed Mrs. Wald by the shoulders, apparently "to use her as a human shield." Mrs. Wald testified, "All I know it was in a split second and both of us were down on the floor." Putting to the side immaterial differences in the testimony, what is undisputed is that after the officers arrived, Luchtel grabbed Mrs. Wald, apparently for protection, and they both ended up on the floor.

While Luchtel was lying on the floor, the police sought to restrain her. Luchtel admitted that she did "everything [she] could to keep [the officers] from handcuffing [her]" because she was afraid the officers were trying to kill her. The officers said that she tried to strike, scratch, and bite them. The officers said that while trying to handcuff her, Luchtel "tried to move her arms and shoulders with such force that it was difficult even to keep a grip on her." Luchtel denies that she tried

to bite, scratch, or hit the officers. Mr. Wald testified that Luchtel was indeed kicking, though not necessarily at the officers, and more generally that he was "amazed" at how much Luchtel fought.

Luchtel was taken to the hospital. The doctors diagnosed her with "[a]cute psychosis secondary to cocaine intoxication," and her urinalysis tested positive for cocaine. The doctors also diagnosed her with a dislocated shoulder and torn shoulder ligaments, requiring surgery. The doctors noted bruises, swelling, and abrasions on her forearms, abdomen, hip, and lower extremities. Luchtel had surgery to fix her shoulder, but she claims that she can no longer swim, hike, play tennis, hold her son, or eat normally. Luchtel also claims that her tooth was chipped during the arrest.

Luchtel sued Officers Hagemann and Hanley and two unnamed police officers under 42 U.S.C. § 1983 for arresting her without probable cause and using excessive force during the arrest. She also sued the officers for false arrest, negligence, and assault and battery under state law. She sued Chief of Police Gil Kerlikowske, unnamed supervisory officers in the Seattle Police Department, unnamed municipal policymakers for Seattle, and the City of Seattle under theories of negligent hiring, training, and supervision. She appeals the district court's grant of summary judgment in favor of the defendants on all these claims.

## II

We review de novo a grant of summary judgment. *Edwards v. Wells Fargo & Co.*, 606 F.3d 555, 557 (9th Cir. 2010). We must determine whether, viewing the evidence in the light most favorable to Luchtel, the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact. *Id.*

## III

We affirm the district court's grant of summary judgment in favor of the officers on Luchtel's § 1983 claim that the police lacked probable cause to arrest her.

**[1]** Probable cause exists when "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986); *see also Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (examining "the events leading up to the arrest" and whether the "historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause" (citation and quotation marks omitted)). Under the totality of the circumstances, a reasonable officer could believe that Luchtel had possessed cocaine in violation of Washington law. *See* Wash. Rev. Code §§ 69.50.4013, 69.50.206. Luchtel's husband and the 911 callers told the police that Luchtel was high on drugs. Luchtel said in her deposition that, given her comments to the police officers, it would have been reasonable for them to believe she was on drugs. Evidence of drug intoxication combined with corroborating evidence can be sufficient to convict for prior possession. *See State v. Carter*, 888 P.2d 1230, 1233 (Wash. Ct. App. 1995). There was probable cause to arrest Luchtel for cocaine possession here.

**[2]** The police officers also had reasonable cause to take Luchtel to the hospital for mental evaluation under Washington's mental health evaluation statute. *See* Wash. Rev. Code § 71.05.150(4) (2006) (current version at Wash. Rev. Code § 71.05.153(2)). That statute gives police officers the authority to take a person to a hospital for mental evaluation upon "reasonable cause to believe that such person is suffering from a mental disorder and presents an imminent likelihood of serious harm or is in imminent danger because of being gravely disabled." *Id.* The officers had reasonable cause under

the statute on the basis of Luchtel's paranoid comments to the officers and the 911 reports that Luchtel had been hiding under a car with her son, screaming that someone was trying to kill her and that she would kill herself. *See State v. Mason*, 782 P.2d 572, 573-74 (Wash. Ct. App. 1989) (noting that witness's demeanor, reported threats of suicide, and known previous suicide attempts justified the officer's determination that custodial detention for mental-health evaluation was appropriate). The district court did not err in granting summary judgment on Luchtel's claims under § 1983 that the officers lacked probable cause to arrest her.[1] They were entitled to subdue her, to arrest her, and to get her to a hospital for assessment.

Alternatively, even if we were to conclude to the contrary that the officers did not have probable cause to arrest Luchtel for possession of cocaine, it is clear that reasonable officers could have so believed from the undisputed facts, and so they would be entitled to qualified immunity on this ground. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009); *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled in part on other grounds by Pearson*, 129 S. Ct. at 818-22.

## IV

**[3]** Even though there was probable cause to arrest Luchtel for cocaine possession, police officers must use a reasonable level of force to effectuate an arrest, and they cannot use excessive force. *See Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993). Whether an individual has been subjected to excessive force under the Fourth Amendment requires consideration of the reasonableness standard set forth in *Graham v. Connor*, 490 U.S. 386, 395 (1989). To determine whether officers used excessive force during an arrest, courts balance

---

[1]In light of this conclusion we need not address the officers' arguments that they also had probable cause to arrest for assault and for obstruction of justice.

"the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quotation marks omitted); *see also Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). We examine the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Miller*, 340 F.3d at 964. We also consider, under the totality of the circumstances, the "quantum of force" used to arrest the plaintiff, *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007), the availability of alternative methods of capturing or detaining the suspect, *id.* at 1054, and the plaintiff's mental and emotional state, *see Deorle v. Rutherford*, 272 F.3d 1272, 1282 (9th Cir. 2001). Although on summary judgment we view the evidence in the light most favorable to Luchtel, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

**[4]** We conclude that under the totality of circumstances, and even viewing the evidence in the light most favorable to Luchtel, the officers' use of force in arresting and detaining her was reasonable. There is no genuine dispute from the evidence that Luchtel posed a threat to herself, her neighbors, and the officers. *See Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (explaining that the "most important single element" from *Graham* is "whether the suspect poses an immediate threat to the safety of the officers or others"). Luchtel was under the influence of crack cocaine, as demonstrated by the hospital's medical report. Luchtel's hiding with her child under a car in the absence of an actual physical threat, her husband's notice to the officers that Luchtel was running around the neighborhood out of control on drugs, her allegedly threatened suicide, and her admission that when the officers arrived in the Walds' home she stood up

and declared that the officers were not actually the police but assassins trying to kill her all show that the police were presented with an irrational and unpredictable person, high on cocaine and to a degree delusional. The undisputed evidence shows that after Luchtel attempted to use Mrs. Wald for protection, Mrs. Wald was taken to the floor with enough force to tear open her blouse, rip her brassiere, and bruise her. Mrs. Wald testified that when the officers arrived, Luchtel was "ballistic," telling the Walds not to let the police come into the house because they planned to kill her. Mr. Wald felt that it was necessary to remove Luchtel's son from the room when the officers arrived. It was reasonable and necessary for an officer confronted with these circumstances to use force to subdue Luchtel and to prevent injury to Luchtel, the Walds, and the officers themselves. In these circumstances, the dominant motive and essential duty for police was to secure safety for all. It was reasonable to subdue Luchtel.

**[5]** Moreover, the evidence is undisputed that Luchtel was actively resisting arrest. *See United States v. Willfong*, 274 F.3d 1297, 1301 (9th Cir. 2001) ("[A] person does not have the right to resist arrest even if the charges are false or the arrest unlawful."). Luchtel admitted to resisting the officers' attempts to detain her. She testified, "I thought they were going to . . . handcuff me, and I didn't want them to handcuff me . . . . So I was resisting them handcuffing me . . . ." Luchtel further testified, "I just remembered, you know, don't let them handcuff me, don't let them handcuff me, so *I was trying to do everything I could* to keep them from handcuffing me." (Emphasis added.) Mr. Wald confirmed Luchtel's resistance: "She was struggling with them when I came in, and to the best of my recollection . . . she was still struggling with them right to the end . . . ." Mr. Wald further testified that he was "amazed" that Luchtel's resistance was so "forceful." Mr. Wald testified that although he knew Luchtel was athletic, "I was still kind of amazed at the resistance that she put up. She wasn't going to be taken lightly." Luchtel's and Mr. Wald's testimony is consistent with the officers' account. Mr. Wald

testified that, even after the officers had placed Luchtel in handcuffs, Luchtel continued to resist and was kicking to get free. Mr. Wald testified, "[S]he was doing everything in her power not to be subdued. And she was—she was acting pretty powerful, because I noticed the police were having trouble subduing her. I was pretty amazed. I really was. I didn't think she had it in her." Because Luchtel acknowledged—and the officers and a neutral third-party witness agreed—that Luchtel was actively resisting arrest, there is no genuine dispute on this issue, and Luchtel's aggressive and resistant behavior weighs in favor of a finding that the officers' use of force was justified.

[6] Although we have held in some circumstances that obstruction of justice, *see Davis*, 478 F.3d at 1055, use of cocaine, *see Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1096 (9th Cir. 2006), and certain domestic-violence disputes, *Smith*, 394 F.3d at 702, are not severe crimes, we conclude that the circumstances were sufficiently severe to account for the amount of force the officers used. Although the officers initially sought to detain Luchtel for mental evaluation, the situation quickly became much more serious. Upon entry, Luchtel became increasingly erratic, expressing her belief that the police officers were assassins hired to kill her. Whatever her motivation, Luchtel lunged at her sixty-seven-year-old neighbor, pulling her to the floor in an attempt to protect herself from her perceived assailants. The force was so great that Mrs. Wald's blouse and brassiere were ripped and she was bruised. The incident also began as a domestic disturbance between Luchtel and her husband. We have previously noted that "[w]hen officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call." *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005) (citation and quotation marks omitted); *see also United States v. Black*, 482 F.3d 1035, 1040 (9th Cir. 2007) ("Our circuit has recognized that the exigencies of

domestic abuse cases present dangers that . . . may override considerations of privacy." (quotation marks omitted)). A caller reported to 911 that Luchtel, who was with her son, was threatening to kill herself. Even accepting Luchtel's testimony and giving her all reasonable inferences, Luchtel's conduct called for the officers to restrain her and was sufficient for the officers to use the level of force employed to detain and arrest her.

Police officers need not use the least intrusive means available to them, *see Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), yet these officers applied the least amount of force necessary to subdue Luchtel by pinning her to the ground and handcuffing her. They did not deploy a taser despite Luchtel's violent, aggressive, and unpredictable behavior. They did not use batons or other weapons, such as pepper spray. There is no allegation that the officers punched or kicked Luchtel or applied knee strikes. Luchtel does not point to any record evidence that the officers engaged in any unnecessary manipulation of her arms. There is no claim or testimony that they wrenched her arms up or gratuitously intensified pain in the handcuffing process. Luchtel contends that she was "held to the floor for at least ten minutes while handcuffed with a broken arm and dislocated shoulder." Given Luchtel's hostile and aggressive behavior, it was reasonable to hold her in that position until she could be removed safely from her neighbor's home on a stretcher with restraints. Even accepting that it was the officers' conduct that caused the break in Luchtel's arm, it can't be disputed that Luchtel's active resistance was a contributing cause to whatever injuries she sustained. Although Luchtel's physical injuries and any limitations from them are distressing, it's not correct to put the blame at the officers' door absent evidence that excessive force was used. Given the totality of circumstances, including the context of the arrest, we conclude that there is no genuine issue of fact that a reasonable level of force was used. *See Jackson v. City of Bremerton*, 268 F.3d 646, 650, 653 (9th Cir. 2001) (affirming excessive-force summary judgment in favor of police officers

even though the plaintiff's finger was fractured and permanently damaged). There is no evidence that would permit a fact-finder to conclude that the officers applied an unreasonable amount of force under the circumstances. *See Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (citation and quotation marks omitted)); *see also Saucier*, 533 U.S. at 204-05 ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed."). Judges must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

Luchtel emphasizes the size disparity between her physical stature and that of the officers as evidence to show a dispute of a genuine issue of material fact over excessive force,[2] but the difference in size alone is insufficient to change the result. People under the influence of mood-altering substances often act in an unpredictable, irrational manner—as did Luchtel. They can exhibit superhuman strength and, despite their physical size, can inflict serious injuries while resisting arrest. Police training teaches officers what experience has confirmed for decades:

> Restraining the emotionally disturbed can sometimes
> be quite a task as they often have increased strength
> as a result of an obsessive drive. If they show signs
> of violence they should always be handcuffed, hands
> behind their back. If they return to normal and
> appear relaxed, do not take off the handcuffs, even
> if they assure you that they are all right.

---

[2]Officer Hagemann was 6'4"and 235 pounds and Officer Hanley was 6'4" and 185 pounds. Luchtel was 5'3" and weighed 120 pounds.

George T. Payton & Michel Amaral, *Patrol Operations and Enforcement Tactics* 344 (11th ed. 2004). By Luchtel's standard, no court may grant summary judgment on excessive force where the police officers are physically much larger than the suspect. We do not accept that standard. Similarly, if it was objectively unreasonable for police officers to intercede here by using a degree of force necessary to subdue Luchtel, then nothing short of retreating and leaving Luchtel's neighbors to fend for themselves would satisfy the Fourth Amendment. This is likewise unacceptable, particularly in a case where Luchtel's own conduct invited the use of force and made it more difficult for officers to take her into custody.

We examine the facts and circumstances of each particular case and we "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Miller*, 340 F.3d at 964 (quotation marks omitted). The importance of the government interest in detaining and arresting Luchtel was significant and compelling, *see* Wash. Rev. Code § 71.05.150(4) (2006) (granting police officers authority to detain persons with mental disorders that present an imminent likelihood of serious harm), and the gravity of the intrusion— low-level use of hands to address Luchtel's drug-induced paranoia—was minimal. We conclude that the facts and circumstances of this case would not permit a finding that the officers used excessive force in arresting and detaining Luchtel. *See Graham*, 490 U.S. at 396 ("[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.").

Alternatively, even if some degree of force used in subduing Luchtel was excessive, a reasonable officer could have thought the force used was needed, entitling the officers to qualified immunity. *Pearson*, 129 S. Ct. at 818; *Saucier*, 533 U.S. at 202. Luchtel has not shown that the use of the officers' bodies and handcuffs in the manner deployed violated a clearly established constitutional right. *See Pearson*, 129 S.

Ct. at 815. A reasonable police officer could properly believe that the use of this level of force would not violate a clearly established constitutional right. *See Jackson*, 268 F.3d at 653 n.5; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (stating that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law).[3]

---

[3]Excessive force cases are fact-intensive, and it's not surprising that reasonable judges might differ in their evaluative judgment. The crux of my disagreement with the dissent is this:

> 1) Because Luchtel does not dispute the key facts about her behavior—that she was under the influence of cocaine and acting paranoid before the officers arrived on the scene at the Wald residence and that she asserted the officers were imposters there to kill her when they arrived—there is probable cause supporting the officers' decision to restrain and detain her. In addition, the evidence of her prior cocaine use and cocaine intoxication gave probable cause to arrest her for cocaine possession.

> 2) Luchtel had no privilege to resist this lawful arrest. That she alleges injury resulting from the attempts of the officers to handcuff her while she resisted arrest and that the officers were large while she was small, individually and together in the totality of the circumstances, do not show that the force used was excessive. Witnesses, including Luchtel herself, agreed that she resisted the officers' attempt to restrain her; there were differences only as to how vigorously she resisted and as to how much of a problem she posed to the officers. There simply is no genuine issue of material fact as to whether she resisted the officers' attempts to restrain her.

Applying the considerations of reasonableness set forth by the Supreme Court in *Graham*, and viewing the record in the light most favorable to Luchtel, we cannot say that the force used was excessive. A reasonable police officer in the position of the defendants had to act to restrain Luchtel, to protect her from herself and to protect themselves and others. The degree of force used was not excessive in light of her fighting the restraint, and the mere fact of consequent injury is not enough to establish excessive force.

## V

**[7]** Luchtel also asserted state-law tort claims for false arrest, for negligence, and for assault and battery. We affirm summary judgment on the false-arrest claim because the police had probable cause to arrest Luchtel. Probable cause is an absolute defense to a false-arrest claim. *McBride v. Walla Walla County*, 975 P.2d 1029, 1032 (Wash. Ct. App. 1999). We also affirm summary judgment on the negligence claim. Officers cannot be liable for detaining a person for a mental-health evaluation under Washington law if the officers acted with good faith and without gross negligence. Wash. Rev. Code § 71.05.120. Because the officers had reasonable cause to detain and reasonably detained Luchtel, they cannot be liable for negligence. In addition, we affirm summary judgment on the assault-and-battery claim. Under Washington law, a police officer has qualified immunity if the officer "(1) carries out a statutory duty, (2) according to procedures dictated to him by statute and superiors, and (3) acts reasonably." *Staats v. Brown*, 991 P.2d 615, 627 (Wash. 2000) (quoting *Guffey v. State*, 690 P.2d 1163, 1167 (Wash. 1984)). We have concluded that the officers were properly carrying out a statutory duty according to the procedures dictated by Washington law and police training, and we have concluded that the officers acted reasonably in detaining and arresting Luchtel. Accordingly, the officers were entitled to qualified immunity on the assault-and-battery claim. *See McKinney v. City of Tukwila*, 13 P.3d 631, 641 (Wash. Ct. App. 2000).

## VI

Finally, we affirm summary judgment dismissing the two unnamed police officers, Chief of Police Gil Kerlikowske, the unnamed supervisory officers in the Seattle Police Department, the unnamed municipal policymakers for Seattle, and the City of Seattle because Luchtel made no arguments in her opening brief for reversal with respect to these defendants. "We will not ordinarily consider matters on appeal that are

not specifically and distinctly argued in appellant's opening brief." *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 994-95 (9th Cir. 2009) (quotation marks omitted).

## VII

We affirm the district court's grant of summary judgment rejecting Luchtel's § 1983 claim that the police lacked probable cause to arrest her and that the police used excessive force in detaining and arresting her. Alternatively, if there was error in either of these respects, and if cause was insufficient or if force was excessive, there was also reasonable belief that arrest was warranted and that the amount of force used was necessary, and hence the officers are entitled to qualified immunity. We also affirm summary judgment on Luchtel's state law false-arrest, negligence, and assault-and-battery claims. Finally, we affirm summary judgment on Luchtel's remaining claims because these were not raised in Luchtel's opening brief.

**AFFIRMED.**

---

BEEZER, Circuit Judge, concurring in part and dissenting in part:

In our judicial system, the jury is tasked with determining the credibility of witnesses and divining from the various testimonies what *really* happened. Because summary judgment deprives a party of the opportunity to have the jury examine the facts, we must view the evidence in the light most favorable to the party who is not seeking summary judgment, here, the plaintiff, Karey Luchtel. Rather than view the evidence in Ms. Luchtel's favor, the court's opinion ignores key testimony from a neutral witness that supports Ms. Luchtel's case and relies instead on the Seattle Police Department officers' version of events. This case should have gone to the jury on

the excessive-force and assault-and-battery claims, and I dissent.[1]

I

If we view the facts in the light most favorable to Ms. Luchtel, the scene unfolds quite differently than the opinion of the court relates. When the Seattle Police Department officers entered the Walds' house on the night in question, Ms. Wald was sitting on the sofa with her arm around Ms. Luchtel, comforting her. After the officers announced themselves to Mr. Wald at the door, they "barg[ed]" into the living room where the women were sitting, did not say anything to anyone, and went straight for Ms. Luchtel. Ms. Luchtel, who was suffering from paranoia, became extremely frightened and said that the police weren't the real police. Mr. and Ms. Wald, however, were unnerved and apprehensive too. Mrs. Wald testified that she was "very shocked" when the police came in because "neither my husband nor I called the police" and "they just barged in." Mr. Wald testified that he was "alarmed by [the officers'] very presence there" and sought to get Ms. Luchtel's son out of the room in case something happened. He took the boy downstairs and out the back door.

Ms. Wald also retreated from the officers. She took her arm off of Ms. Luchtel, and walked over to the organ bench. As Ms. Wald recounted, "I thought if the police were going to go over to her, I wasn't going to get involved with the police." Ms. Luchtel followed Ms. Wald, whom Ms. Luchtel viewed as providing comfort and safety. She stood behind Ms. Wald. The police lunged toward the women, and Ms. Luchtel grabbed onto Ms. Wald, and both women fell on the floor. During the fall, Ms. Wald's blouse buttons came undone. As Ms. Wald was "put[ting] [her]self together," Ms. Luchtel was

---

[1] I concur in Parts III and VI of the court's opinion. I also would affirm the grant of summary judgment on Ms. Luchtel's state-law negligence and false-arrest claims.

still lying on the floor. According to Ms. Wald, an officer then "tackled" Ms. Luchtel, and the other officer quickly joined him. Ms. Luchtel, still terrified, said, "Don't let them take me. They're not the police." In response, the officers taunted her, saying "you'll know that we're the real police." "[T]hey were not very kind to her, I must admit," Ms. Wald recalled.

Ms. Wald testified that after the officers tackled Ms. Luchtel, they were immediately able to control and handcuff her: "She wasn't able to fight, the poor thing. She was on the floor. She wasn't—they had her arms behind her, and she was literally on her front. And they couldn't—they had her legs shackled and her arms shackled so she couldn't move." The officers reported that they used their body weight to hold Ms. Luchtel down even after she was in handcuffs. At some point later, the ambulance arrived, and Ms. Luchtel was transported to the hospital. At the hospital, the doctors observed bruises, swelling, and abrasions on Ms. Luchtel's forearms, abdomen, hip, and lower extremities. Worse, she had suffered a dislocated shoulder and torn shoulder ligaments. The dislocation had caused a Hill-Sachs fracture—a bone fragment had chipped off in the process of the dislocation and was lodged in the rotator cuff between her socket and arm—and surgery would be necessary. She had surgery to fix her shoulder, but she can no longer swim, hike, play tennis, or even eat normally.

## II

Considering the facts favorable to Ms. Luchtel, I cannot agree with the analysis of the *Graham v. Connor*, 490 U.S. 386 (1989), factors set out in the court's opinion.

First, the "most important single element"—"whether the suspect poses an *immediate* threat to the safety of the officers or others"—weighs in Ms. Luchtel's favor. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (emphasis added) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir.

1994)). In concluding that this factor weighs against Ms. Luchtel, the opinion of the court relies on events that took place *before* the officers used force against her. The opinion argues that the fact that Ms. Luchtel hid under the car and yelled that someone was trying to kill her shows that she posed a danger to the officers, the Walds, or her son. However, this factor must be analyzed at the time the officers used the alleged excessive force.

At the time force was used Ms. Luchtel did not pose an immediate danger to anyone. Mr. Wald and Ms. Luchtel's son had already left the room so she posed no danger to them. Ms. Luchtel also did not pose a threat to the Seattle Police Department officers—she was an unarmed, 5'3", 120 pound woman, face-down on the floor. The officers were both 6'4"; one weighed 185 pounds and the other 235 pounds. And a reasonable jury could conclude that the officers would have known that Ms. Luchtel did not pose a danger to Ms. Wald. When the officers first entered the Walds' home, they observed Ms. Wald sitting with her arm around Ms. Luchtel, comforting her. Ms. Wald testified that she was not afraid of Ms. Luchtel at any point and that Ms. Luchtel had not done anything to try and hurt Ms. Wald or the officers.

A reasonable jury could believe that the officers reasonably thought that Ms. Luchtel assaulted Ms. Wald when the two women fell down—as the court's opinion argues—but a reasonable jury could also believe that reasonable officers would have known that Ms. Luchtel was just scared and seeking protection from the motherly figure who had just been comforting her, Ms. Wald. The jury could believe that when the officers lunged for Ms. Luchtel, they made the women fall from their precarious position on the organ bench.

The point is not whether Ms. Luchtel posed a danger to herself or others in the long run without psychiatric help. I agree that the officers had reasonable cause to take Ms. Luchtel for psychiatric counseling and that they could use reasonable

force to do so. But I think a reasonable jury could find that Ms. Luchtel posed no *immediate* danger to the officers, herself, or anyone else at the time the officers "tackled" her and dislocated her shoulder.

Second, Ms. Luchtel's crimes were not severe. The officers had probable cause to believe that she had possessed cocaine. They also had reasonable cause to believe that she was paranoid and mentally disturbed and needed to be taken in for mental evaluation. Ms. Luchtel also admits that she resisted arrest. But cocaine use, mental disability, and obstruction of justice are not severe crimes. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (holding obstruction of justice not severe crime); *Tatum v. City of S.F.*, 441 F.3d 1090, 1096 (9th Cir. 2006) (holding cocaine use not severe crime).

And although the court's opinion takes great pains to point out that domestic *violence* situations may be especially hazardous to police officers, this was not a domestic violence situation. The actions did arise out of an argument between spouses, but by the time the officers entered the Walds' house, the officers knew that Ms. Luchtel had committed no violent acts, and Mr. and Ms. Luchtel were in separate houses.[2] Not every situation that takes place in a house or in the context of a family—and thus is "domestic"—poses the same level of threat to officers or others.

Third, there is a genuine dispute of material fact about how much Ms. Luchtel was actually resisting—or able to resist.

---

[2]Even domestic violence may not always be a severe crime for the purpose of the Graham analysis. *See Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (holding that the severity of the crime provided little basis for the officers use of force where the victim-wife called 911 to report that her husband "was hitting her and/or was physical with her" because the plaintiff-husband was separate from his wife and had no access to weapons).

Ms. Wald stated in her deposition that she did not remember Ms. Luchtel struggling with the officers at all:

> Q: Was she doing anything to try and hurt the officers that you could tell?
>
> A: I don't think so. Not that I could see. . . . She went [down] with me on the floor, and when I got up, they went to her and kept her down on the floor. She was lying on the floor all the time.
>
> . . . .
>
> Q: Did it look to you like they had any problems taking control of Karey?
>
> A: I didn't think they had any trouble. I didn't think they had any problems with them, no.

Ms. Luchtel similarly testified that the struggle only lasted "a couple seconds." The court's opinion places a lot of stock in Mr. Wald's testimony that he was "amazed" how much she struggled, but he was out of the room when the women fell on the floor and when the officers allegedly injured Ms. Luchtel. When he came back, Ms. Luchtel was already in handcuffs.

Fourth, the court's opinion fails to analyze the three *Graham* factors in relation to the amount of force that the officers used. *See Chew*, 27 F.3d at 1441. "The three factors articulated in *Graham* . . . are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure . . . ." *Id.* Even accounting for the fact that Ms. Luchtel resisted arrest to some extent, there is still a genuine issue of material fact as to whether the officers used excessive force: "[I]f the extent of the injury . . . is serious enough, a jury could conclude that [the officer] used force in excess of what was reasonable, *even if [the plaintiff] had been resisting*

*at the time*." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) (emphasis added). Moreover, even if the officers did not use any more force than was needed to arrest Ms. Luchtel—a fact that is certainly in dispute—the excessive force inquiry is not over. The relevant inquiry is not whether the force the officers used "was no greater than that required to overcome [Ms. Luchtel's] resistance. . . . [I]t is whether the force used was reasonable in light of *all* the relevant circumstances." *Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir. 1991) (en banc). A reasonable jury could conclude that although Ms. Luchtel resisted arrest, the Seattle Police Department officers used excessive force by dislocating her shoulder, causing a Hill-Sachs fracture, and causing significant bruises, swelling, and abrasions on most of her body. Ms. Wald testified in her deposition that she was "not surprised if [Ms. Luchtel] did have an arm injury the way they, you know, put her arm around like this. They put her arms right around her back." She emphasized: "These are big guys. And Karey is about the same size I am. And like I say to my kids, 'Hey just be careful there, you buddies. You don't know what you're doing here.' "

Although it is true that the officers did not use tasers, batons, or other weapons to subdue Ms. Luchtel, that is not to say that the use of brute force and advantage in weight and size cannot be excessive. To say that would give officers a free pass as long as they just used their hands. The officers could always point to other weapons "they could have used." I do not mean to suggest that "no court may grant summary judgment on excessive force where the police officers are physically much larger than the suspect," Rather, I just think in light of the short time that Ms. Luchtel resisted, her minor crimes, the vast difference in size and weight, and Ms. Wald's corroborating testimony, that a reasonable jury could conclude that the officers used excessive force. In light of these facts, a reasonable jury could find that the officers used excessive force when they pulled Ms. Luchtel's arms around her back, when they used their body weight to keep her down

even after she had been handcuffed, or when they left her "handcuffed [on the floor] so tight that it left scars."

Finally, I believe the court's opinion errs by failing to account for the fact that Ms. Luchtel was mentally disturbed. Our precedent holds that "a detainee's mental illness *must* be reflected in any assessment of the government's interest in the use of force." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) (emphasis added). Indeed, we have specifically stated:

> The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance *or resisting arrest* are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. . . . [W]e emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that *must* be considered in determining, under *Graham*, the reasonableness of the force employed.

*Id.* (emphases added) (internal citation omitted). Here, it was apparent that Ms. Luchtel was "mentally unbalanced" or "emotionally disturbed" in light of her actions and comments that the officers were not the "real police." Indeed, in his declaration about the incident, Officer Hanley stated that when he saw Ms. Luchtel, he "concluded" that she had a "mental dis-

ability." A reasonable jury could conclude that the officers' actions of "just march[ing] in" and "grab[bing]" Ms. Luchtel without identifying themselves or saying anything to Ms. Luchtel—when the officers were aware that she was mentally disturbed—unreasonably exacerbated the situation. The court's opinion wholly fails to include this *mandatory* mental-disability factor in its analysis when it concludes that no reasonable juror could find that the police used excessive force.

## III

For the reasons I have discussed under the excessive-force analysis, the officers are also not entitled to qualified immunity.[3] It is true that qualified immunity is "an immunity from suit rather than a mere defense to liability" such that immunity questions should be resolved "at the earliest possible stage in litigation." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quotation marks omitted). But it is also true that excessive-

---

[3]Similarly, Ms. Luchtel's state law assault and battery claims should go to the jury. In Washington, claims that the police used excessive force during arrest are brought as assault and battery claims, *see Boyles v. City of Kennewick*, 813 P.2d 178, 179 (Wash. Ct. App. 1991), and qualified immunity is not "available for claims of assault and battery arising out of the use of excessive force to effectuate an arrest," *Staats v. Brown*, 991 P.2d 615, 627-28 (Wash. 2000) (en banc). As I have discussed, there are genuine issues of material fact as to whether the officers used excessive force so qualified immunity is inappropriate under Washington law. Also, the officers are not immune under Revised Code of Washington section 71.05.120, which provides that "no[ ] peace officer . . . shall be civilly or criminally liable for performing duties [relating to the decision to admit a person for mental] evaluation and treatment: PROVIDED, That such duties were performed in good faith and without gross negligence." Ms. Luchtel has presented sufficient evidence to present a triable question of gross negligence. And in *Estate of Lee v. City of Spokane*, the Washington Court of Appeals stated that "we cannot find any difference between the question of good faith and the question of federal immunity which turns on whether officers could have believed their conduct to be 'lawful, in light of clearly established law.' " 2 P.3d 979, 991 (Wash. Ct. App. 2000) (discussing a similar immunity statute). Thus, Ms. Luchtel's assault-and-battery claim survives state law qualified immunity.

force cases "almost always turn on a jury's credibility determinations" and therefore "summary judgment . . . in excessive force cases should be granted sparingly" even with respect to the issue of qualified immunity. *Smith*, 394 F.3d at 701, 704 n.7. These opposing imperatives make the issue of summary judgment on § 1983 claims tricky indeed. But the balance here tilts in favor of trial.

The right to be free from excessive force in handcuffing is clearly established in our precedent. *See, e.g.*, *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (rejecting qualified immunity because it was "clearly established" that the amount of force used in handcuffing the plaintiff was excessive). This is true even when the plaintiff actively resists handcuffing. *See LaLonde*, 204 F.3d at 952, 960 (rejecting qualified immunity). As for whether the officers could reasonably have believed that the force they used was reasonable, here, as in many excessive-force cases, the "issue of tight handcuffing is usually fact-specific and is likely to turn on the credibility of the witnesses." *Id.*; *see Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993) (rejecting qualified immunity where the officer handcuffed the plaintiff so tightly that he suffered pain and bruises).

Qualified immunity is simply not available here where we have a case directly on point demonstrating that it is clearly established that the police conduct was excessive. In *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989), we unanimously reversed the grant of summary judgment on the excessive force claim where the plaintiff claimed that her "handcuffs were put on in an abusive manner" and "she had bruises on her wrist and under her upper arm, and she complained of pain in her little finger and upper arm."[4] We denied summary

---

[4]The court's opinion cites to *Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir. 2001), arguing that the officers' force was reasonable because summary judgment was granted in *Jackson* in favor of the officers "even though the plaintiff's finger was fractured and permanently dam-

judgment there even though the officers believed the plaintiff was committing the serious offense of assisting a robbery suspect and attempting to destroy evidence. *See id.* at 643. Under *Hansen*, qualified immunity is not appropriate. Luchtel's crimes were less serious, and her injuries were much more severe—a dislocated shoulder, torn shoulder ligaments, a shoulder bone fracture in addition to bruises all over her body. It is clearly established in the Ninth Circuit that causing fractures and dislocating shoulders while handcuffing a suspect is excessive force.[5]

IV

Although I concur in the remainder of the court's opinion, I must dissent with respect to the excessive-force and assault-and-battery claims. On these claims, the court's opinion weighs the facts and testimony in this case much as jurors would in the jury room. It concludes that *no reasonable juror* could conclude that the Seattle Police Department officers

---

aged." But the facts in *Jackson* are completely different. There, several police officers confronted a group of 30 to 50 people when they attempted to arrest a suspect with an outstanding warrant for theft. *See Jackson*, 268 F.3d at 649. When the suspect attempted to flee, "[f]ights broke out between the officers and other members of [the plaintiff's] group." *See id.*

[5]*Hansen* was decided before *Saucier v. Katz*, 533 U.S. 194 (2001), but post-*Saucier*, we have repeatedly recognized that *Hansen* is still viable and that it precludes qualified immunity in cases like this one. *See Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (citing *Hansen* for the proposition that "it was clearly established that the amount of force [the plaintiff] says [the officer] used in handcuffing her was excessive, and a reasonable agent in [the officer's] position would have known that such conduct violated the Fourth Amendment"); *see also Davis v. City of Las Vegas*, 478 F.3d 1048, 1057 (9th Cir. 2007) (recognizing *Hansen*'s continuing viability). The unpublished cases recognizing *Hansen* after *Saucier* are even more numerous. *See, e.g.*, *Martinez-Rodriguez v. United States*, No. 09-35386, 2010 WL 1473991, at *1 (9th Cir. Apr. 14, 2010); *Long v. Pend Oreille County Sheriff's Dep't*, 269 F. App'x 749, 751 (9th Cir. 2008). *Pearson* does not affect what is "clearly established" for qualified immunity.

used excessive force here. And yet, it leaves out half of the testimony—the other side of the story. We are appellate judges, not jurors. This case should have its day in court.